Good morning, Your Honors. Good morning. May it please the Court, Alexandra Cruz for the petitioner Maria Absalon Linares. Petitioner appeals the adverse credibility finding in this pre-Real ID Act case as the sole basis for denial by the Board because it is not supported by substantial evidence. The petitioner's arguments are as follows. First, the petitioner was not provided an opportunity to give a reasonable explanation for her inability to state the full acronym of her political party. Second, the petitioner provided a plausible explanation for her additional testimony and the record does not demonstrate what happened at the asylum interview. And third, the petitioner provided corroborating evidence, which was ignored by the BIA. So first, regarding the acronym COPAI, which is the petitioner's political party, she was asked on cross-examination only one time if she knew the meaning of the acronym. She stated that she knew part of it, and that was the end of the inquiry. The IJ never asked her another question about it. The government never asked her another question about it, and that was the end of the inquiry. Did she have a lawyer? She did have a lawyer, yes, and the lawyer also did not ask her about it. However, this alone does not undermine her credibility. There are many instances, many reasonable explanations in which one person could be involved with an organization and not know the meaning of the full acronym. For example, many scuba divers are unable to state the meaning of the acronym SCUBA. Many politically inclined people may not even know the meaning of GOP, and I'm sure many of us have donated to organizations such as UNICEF without knowing every single letter. But like my client, we could probably tell some of those. These are possible explanations. The real explanation, we don't know because the petitioner was not given an opportunity. Well, you only need one. Yes. And the one that concerns me is the assault. Yes. And she blames that on that she had a notario prepare it. But I don't know if there's really any evidence in the record that a notario did it. But then along with that, you've got the situation when she's interviewed by the asylum officer, she doesn't mention it there. In my view, that one goes right to the heart of the claim, and I don't know why that wouldn't support an adverse credibility right there. Yes, Your Honor. So there are two points in that which I would like to address. I think there are two separate things that we must look at. First, the record of the asylum interview is nowhere in the record here. We have the referred 589 application, and that does have some annotations regarding biographical information. But in the substance of the claim, there are no notes, there's nothing there. We have no asylum officer notes, and we do not have a referral notice. And additionally, the petitioner did not testify as to what happened in the asylum interview. So for all intents and purposes, this record is completely void of any evidence of what happened. And in support of the BIA's determination that this was not addressed in the asylum interview, it cites to the Cower v. Gonzalez case. But in that case, the alien went to the hearing, to her asylum, excuse me, her individual calendar hearing before the immigration judge, and stated what happened in the asylum interview. It's unclear from the decision whether or not the asylum officer's notes were in the record there, but it is clear that the alien herself did state what she stated, and in essence admitted that she changed her story before the immigration court. We do not have that here. There's no time that the petitioner states that she's changing her story, and in fact she never did. And turning to the issue of adding this in and working with a notary or notario, there is a plausible explanation for that in this case, and it's that she worked with a notario. She did not speak English at the time. She signed the application, and this is similar to the Garo Villas v. INS case, which is cited in the Cower v. Gonzalez case, where the court found that when the alien could not read the application, sign the application, and then change their testimony about it at the hearing, that was a plausible explanation because they did not read the application at the time. That's the exact case that we have here. She could not read it, and to this day she does not speak English, so the fact that the entire application is in English means she could not have read it herself. She did sign it, but then most importantly in this case is that she has this extra testimony regarding the attack that was not included in the 589, but then she has three affidavits that support her new added testimony that have to be accepted as credible. The government never objected to them. The immigration judge never made a negative credibility finding or gave them diminished weight, so those must be accepted as true. Those three affidavits corroborate the entire claim of the petitioner, and so turning to the issue of corroboration here, the BIA was requiring that the petitioner's mother make a statement regarding her efforts to obtain medical records, and here one of the affidavits corroborates the petitioner's time in the hospital because the affiant swore that she personally brought the petitioner to the hospital the day after she was attacked, and this affiant was available for cross-examination. She was listed on the list of witnesses to be cross-examined, and it was never done so, and no one took the opportunity to do so. And additionally, the mother was available. She was one of the affiants, and she was made available for cross-examination, but again, no one took the opportunity to do so, and so in the previal idea case, an asylum applicant can establish credibility through either or establish their testimony through either credible testimony or documentary evidence, and so what we have here is even if we discount the petitioner's credible testimony, if we discount that, we look only to the record here. We have these three affidavits that make out, that support the petitioner's testimony, that make out a case for the petitioner, and they have a positive credibility finding. This seems to have been ignored by the BIA. The BIA does not make any mention of the fact that it considered all of the evidence in the record. That statement is not in their decision, and additionally, they do not make any mention of the meat of these affidavits that were submitted. They do only mention the mother's affidavit insofar as to say that she did not provide these corroborating documents, and so the BIA erred here in looking to the Onukahaulu case to require additional corroborating documents because they did not find the petitioner credible. What was in the other documents exactly that's so critical? These three, the three affidavits? One was from the petitioner's friend who picked her up after she was physically assaulted, personally brought her to the hospital, and then testified about bringing her the next day, I believe, to her mother's house. The mother's affidavit states that she saw the petitioner the day after she was attacked and talks about threats that the family received, and the third affidavit was from the petitioner's cousin who stated that he personally saw members of the opposing political party who burned the petitioner's car. And so those were the three affidavits that were in the record. And again, without ever having turned to those affidavits and turned to the record, it was improper for the BIA then to require additional corroborating evidence because it did not first look at the corroborating evidence in the record. So finally... Clearly the IJ said that in this case he recognized you had to look at the documentary evidence. Are you saying just because the BIA didn't actually make that statement that that's an error? Yes, I am. And what is your best support for that? Your Honors... Well, Your Honors, I cannot provide a case right now, but I do know that it is general jurisprudence of the Ninth Circuit that it is required that that statement, that they do take note of all of the records and all of the documents in the record, and that was not done here. If I may reserve the remaining time for rebuttal. Thank you. Good morning. Good morning, Your Honors. May it please the Court. My name is Allison Frayer for the Attorney General. In this case, the record cannot compel the conclusion that Ms. Absalon testified credibly in light of the significant embellishments she included during her hearing testimony that she did not mention during the asylum interview or on her asylum application. Let me... Can you clarify from your perspective, Ms. Frayer, what the record says on the point of the assault? The record says... Okay, it's the asylum application, it's not in there. Correct. All right. And her explanation is that, I think, as appellant's lawyer said, she doesn't speak English and that she had a notario and she just signed it. That's what she claims, yes. All right. What other evidence in the record was there about even being a notario, that there was a notario? Is there... There's none. Ms. Absalon testified that a notario helped her named Marie Perez, but there's no evidence of that. She also claims that this notario, a non-attorney preparer, has been accused of fraud, but there was no effort to discover if that is true  Ms. Absalon testified during the hearing, despite Petitioner's Counsel's claims today, Ms. Absalon testified clearly that she knew the application was incomplete and she signed it anyway because it seemed like the right thing to do. She signed it doing that even with the notario, but then again... So there really isn't a dispute about... She knew that the assault was not in there. That's correct. That's clear from the record. What's the evidence about the asylum officer's interview in the record? There's almost none. She signed it during the interview, so we know that the interview took place and the date and that it was here in Seattle. Other amendments were made... So just to be clear then, all this kind of happens all at once. Yes. In other words, it's not the two-part step where she puts in the application and then she comes back and she has another chance to look at it. It's all kind of collapsed. No, that is true. She filed the application in 1993. For some reason, nothing happened. Then in 2007, years later, she's called for the interview, and at that point she sees the application again. That's the government moving with all deliberate speed. I have no idea what happened in this case, but it's true. At that point she knows the application is incomplete, she says. Yes, she signs it again. She sees it again in the interview. She signs it again under oath in front of an asylum officer. It's unclear whether she was represented by counsel before the asylum officer, but there's a notice of appearance dated before 2007 in the record, so it seems that she probably was. And is there any evidence that at that point, because she doesn't speak English, that she couldn't understand what she was re-signing? No. Asylum interviews are done in the applicant's language. The applicant must bring her own interpreter. But the application was done in English. That's true. That's what I'm asking about, the written application. Ms. Absalon testified that the non-attorney preparer read the application back to her in Spanish, so she was aware of the contents. So when she testified at the immigration in front of the IJ, what did she say about her knowledge at the asylum interview, that she knew it wasn't complete at that time? Yes. She said she signed it without the beating and the threatening phone calls because it seemed like the right thing to do, which is not true. You have to say everything that happened to you, and I think that's clear from the instructions in the asylum application and in the instructions that all asylum officers give at the beginning of their interviews. Other amendments were made to the asylum application during the 2007 interview. You can see the marks from the asylum officer, so it's clear that Ms. Absalon was aware that she could change the application and that she needed to do so to keep it up-to-date and correct. As far as the corroboration, the affidavits that are in the record, Ms. Absalon must still testify credibly. She can't rely on other people to provide credible testimony for her asylum application. She must testify credibly, and if she wanted to provide either her friend or her mother's testimony telephonically, it was up to her to provide that. She bears the burden of proof, the burden of persuasion, and if she wanted to use those witnesses to improve or corroborate her case, she could have done so. There's no evidence that she attempted to do so here. She knew that the medical records were going to be an issue because she was questioned about them at length on cross-examination, so she was aware that this was going to be an issue and she should have called her mother or her friend at that point if that was going to be important. Many of the claims that Petitioner makes in her opening and the new claims in her reply brief were unexhausted to the Board, a claim of erroneous interpretation, and it seems like she's hinting that the agency counsel might have been ineffective, but those claims need to be presented to the Board first. And if the Court has no more questions? I'll let you have the remainder of my time. Did you both coordinate how you were going to look today? Yeah. I look out and decide what are which lawyers on which case, and I couldn't tell who, but I thought, they're together. Not quite. May it please the Court. If I may just address a couple things here. Counsel is incorrect in stating that the Petitioner did state that she did not testify to this attack in her asylum interview. If we look at page 179 of the record, the Petitioner's comment on what happened at the asylum interview comes after a complex question that was asked by, or a compound question, excuse me, that was asked by the government attorney in that time. I believe there are five or six questions in a row, and then at the end the Petitioner said, well, I think that was not the most correct thing to do. And she's not sure what she's referring to. If you look at the page preceding that, the Petitioner had been being asked about her nightmares that she was suffering, inability to sleep, insomnia. So it's not really sure. It's unclear if the Petitioner knew exactly what the point of that question was. And that's at 179. Additionally, a note regarding the notaries, the notarios. It's a general practice of notarios to not sign applications that they fill out. I can't provide a case on that. I think that that's something that can just be judicial notices that they don't do that. And so the fact that it wasn't signed by a notario does not negate the fact that it actually was prepared by a notario. And regarding her signing the application again in 2007, this was ‑‑ she did sign it again, but, again, we do not know what she testified to, and nothing in her testimony contradicts what was in that application. Thank you, Your Honor. Thank you. The matter just argued is submitted for decision. And we compliment counsel on their coordinated appearance here today. Maybe it's the asylum uniform.
judges: Schroeder, McKeown, Callahan